JUSTICE NELSON
dissents.
¶23 I dissent from our decision to affirm the trial court’s dismissal of 1st Bank’s complaint. Rather, I agree with 1st Bank that there are material issues of fact that the court should have permitted to be resolved by way of a trial.
¶24 Clearly, § 27-17-401(1), MCA, provides authority for 1st Bank to recover not only possession of the tractor, but “damages for the detention” of the tractor as well. See also §§ 27-17-402 and 403, MCA. I disagree with the majority’s statement in ¶ 17 that minimizes the importance of detention damages. The very purpose for the statutory allowance of detention damages is to make the claimant of the property whole-i.e., to return to the rightful owner his property and to compensate him for any loss in value of the property resulting from the wrongful detention.
¶25 Judge Cybulski’s September 17,2001 order dismissing 1st Bank’s cause of action was premised on there being no order in effect at the time when Winderl delivered the tractor to Deines. That conclusion, assuming it is accurate, is not dispositive. If 1st Bank proves-and I believe that it can-that Winderl knew of its security interest in the tractor, but wrongfully retained possession, then the absence of an order is irrelevant.
¶26 In this regard, a review of the entirety of the record in this case leads inescapably to the conclusions: (a) that Winderl knew at least as early as November 1998, that 1st Bank claimed a security interest in the Ford New Holland bi-directional tractor he had received from *313 Deines; (b) that Winderl knew precisely which tractor the deputies were looking for-i.e., the one he received from Deines-when they attempted to recover the tractor on June 2,1999; (c) that Winderl took the position that he was entitled to retain the tractor because his interest was superior to 1st Bank’s; and (d) that on the advice of his counsel, Winderl re-delivered the tractor to Deines rather than turn it over to 1st Bank.
¶27 Winderl obviously knew of 1st Bank’s foreclosure suit against Deines because on June 23, 1998, Winderl’s attorney sent a letter to 1st Bank’s president notifying the Bank that Deines was indebted to Winderl and that he (Winderl) intended to file crop liens in Dawson County against Deines.
¶28 Moreover, on November 13, 2000, Winderl testified, under oath, in an order to show cause hearing involving Deines before Honorable Gary Day in Cause No. DV 96-096, Seventh Judicial District, Dawson County. With respect to the Ford New Holland bi-directional tractor Winderl received from and then re-delivered to Deines, Winderl testified as follows:
Q. Is it possible that you had a conversation with Sheriff Wessler concerning this tractor in early November of 1998?
A. I’m thinking it wasn’t Wessler, I thought maybe it was Buerkle, but that was possible, maybe.
Q. Okay. And during that conversation, did you' tell Sheriff Wessler that you were not ... that your interests in the tractor were superior to that of the bank and that you were not willing to give it up?
A. Yup, I did.
Q. And did you also tell the Sheriff that you were going to go to your attorney?
A. Yup.
❖ * * *
Q. So, Mr. Winderl, then, and if I understand the Court’s ruling correctly, is it true that after November 2,1999, you delivered the tractor in question, the Ford bi-directional, to Mr. Deines?
A. I didn’t deliver it, no. I just parked it in my yard and told him to come and get it.
jH
Q. Okay. And what else was said during that conversation, Mr. Winderl?
A. I told him to pick it up and never ever bring it back.
¶29 Winderl’s August 11,1999, Affidavit in Support of [his] Motion for Summary Judgment on Issue of Proceeds states:
*314 3. Later in the summer, Deines purchased a second tractor (another bi-directional Ford New Holland) for approximately $47,000. No filing was ever made by Plaintiff [1st Bank] on this tractor.
4. In March of 1997, Deines approached me and asked if I would feed some livestock he had purchased in my feedlot facilities west of Glasgow. I was aware of his bankruptcy and he told me that I could have the tractor if I would feed these livestock, which I agree to. He gave me a bill of sale to the tractor and I was unaware that Plaintiff [1st Bank] was making any claims after Deines bankruptcy to this particular tractor until the present proceedings were instituted.
¶30 Setting aside his contradictory sworn statements regarding his knowledge of 1st Bank’s claims to the tractor, Winderl’s affidavit indicates no confusion over which tractor was at issue. Winderl makes no claim that he had more than one Ford New Holland bi-directional tractor and no claim that determining the VIN number of the tractor was critical in his decision to return the tractor. Indeed, Winderl’s defenses to 1st Bank’s suit did not go to confusion about the identity of the tractor, but, rather to the issue of whether 1st Bank had a valid security interest in the tractor. Winderl knew perfectly well the identity of the tractor in which 1st Bank claimed its security interest.
¶31 Moreover, the record reflects that when the deputies went to Winderl’s farm on June 2, 1999, to recover the tractor, after greeting them with profanities, Winderl stated that he had a bill of sale of his purchase from Deines. The record is clear that Winderl knew that the deputies were there to take possession of that tractor. Notwithstanding, Winderl refused to let the deputies take the tractor. At the September 25, 2000 hearing on Winderl’s motion to dismiss, Undersheriff Tymofichuk testified that when he went to Winderl’s farm on June 2, 1999, to recover the tractor, Winderl had only one Ford bi-directional tractor in his yard. Winderl claimed it was possible that the tractor in his yard could belong to someone else. However, even if that were true, Winderl obviously knew which tractor he received from Deines (he certainly knew which tractor to return to Deines) and he, therefore, knew the tractor in which 1st Bank had a prior security interest.
¶32 The record belies the majority’s rationale that the deputies being unable to locate the tractor’s VIN number excused Winderl from turning the tractor over to them on June 2, 1999. That the deputies were reluctant to seize the tractor without being first able to locate the VIN number does not excuse Winderl from relinquishing the tractor to *315 them when he clearly knew which tractor the deputies were looking for. And, the record is clear that he did.
¶33 Rather than apply the summary judgment standard at issue here-that is, whether genuine issues of material fact exist-the majority engages in selective fact-finding. In addition, it improperly relies on Lurie and Hennessy. It is true that Lurie was an appeal from a grant of summary judgment and, to that extent, it conceivably could be applicable for some purpose here. However, the quote from O’Connell which the majority lifts from Lurie relates to a case in which a “preponderance of the evidence” standard applies; that is, a post-trial appeal, rather than a summary judgment action. Lurie, ¶ 21. In the present case, that standard is totally inapposite. We need only determine whether genuine issues of material fact exist and, as set forth above from the record, they clearly do. With regard to our nearly 80-year-old decision in Hennessy, that case-like Lurie-is inapposite, because the issue in that case was whether a complaint stated a cause of action for claim and delivery. Hennessy, 69 Mont. at 48, 220 P. at 101. Hennessy did not involve summary judgment and, indeed, relied solely on even older cases from other jurisdictions in support of the proposition for which the majority cites it here.
¶34 The issue before us in this appeal is whether Judge Cybulski erred in granting summary judgment to Winderl and in dismissing 1st Bank’s claims for damages arising from Winderl’s wrongful detention of the tractor. At the very least there are genuine issues of material fact as to Winderl’s knowledge of which tractor the deputies were looking for; as to whether his retention of possession of the tractor from and after November 1998, was wrongful; and as to whether 1st Bank suffered compensable damages as a result of Winderl’s conduct.
¶35 After reviewing the entire record de novo, I would hold that summary judgment was improperly granted. 1st Bank has been denied its day in court.
¶36 I dissent.
CHIEF JUSTICE GRAY and JUSTICE RICE concur in the foregoing dissent.